IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| RICARDO VARGAS | § | |
| v. | § | CIVIL ACTION NO. 9:05cv108 |
| DAVID STACKS, ET AL. | § | |

MEMORANDUM ADOPTING REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND ENTERING FINAL JUDGMENT

The Plaintiff Ricardo Vargas, proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged deprivations of his constitutional rights. This Court ordered that the case be referred to the United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

Vargas complained about the medical care which he received in the prison, asserting that he was the victim of retaliation. The Magistrate Judge conducted an evidentiary hearing on September 13, 2005, giving Vargas the opportunity to testify about his allegations. Following the hearing, the Magistrate Judge issued a Report recommending that all of the Defendants except for Dr. Betty Williams be dismissed from the case. The Magistrate Judge ordered Dr. Williams to answer Vargas' lawsuit.

In response to the order to answer, the Attorney General for the State of Texas notified the Court that Dr. Williams was on military leave overseas, serving in Iraq. On March 3, 2006, the lawsuit was administratively closed until Dr. Williams returned from military leave.

After the case was reopened, Dr. Williams answered the lawsuit, and subsequently filed a motion for summary judgment. Vargas filed a response to this motion on March 26, 2007.

Dr. Williams' motion for summary judgment says that Vargas was diagnosed with a torn anterior tibio-fibular ligament (ATFL) in his ankle in May of 2003, and in August of 2003, he was transferred to the Eastham Unit. When he arrived, his health summary for classification form, known as an HS-18, was updated by unit physician's assistants to reflect that he did not require low bunk, low row housing, which he had previously had. Vargas requested and received a 30-day cane pass in early October of 2003.

On October 13, 2003, Vargas was seen in the orthopedic specialty clinic, where he was found to have no significant laxity on stress testing, despite the history of the ATFL tear. The clinic personnel recommended low bunk, low row housing, but clinic recommendations are not binding upon unit physicians. The clinic personnel also concluded that Vargas did not require surgery, but would have a follow-up appointment with the telemedicine clinic.

When Vargas returned to the unit, his records were reviewed by Dr. Williams and P.A. Larry Settles, who concluded that Vargas did not require low bunk, low row housing or medical boots. Although Vargas says that a phone call from a Galveston physician named Dr. Shabazz on October 23, instructing the Eastham medical personnel to medically unassign him, sparked the alleged retaliation, Dr. Williams stated that the medical records show that these decisions were made on October 15, before the call took place.

Vargas also claimed that retaliation was shown by the fact that on October 6, 2003, Dr. Williams had renewed a cane pass for him, but that on October 24, the day after the phone call, it was rescinded. However, Dr. Williams said that the cane pass was discontinued because of the no-significant-laxity finding from the clinic and because two nurses wrote that they had seen Vargas walking normally and swinging his cane instead of using it properly.

Next, Dr. Williams stated that Vargas complained that an orthopedic appointment in December of 2003 had been canceled, with the records showing that Vargas had refused when in fact he had not. Dr. Williams said that the medical records show that the erroneous refusal had been noted by P.A. David Onuora, not her, and there were some indications in Vargas' grievances that the

2

cancellation had been an accident, done when another inmate named Vargas signed a refusal slip and it was erroneously imputed to the Plaintiff. Finally, Dr. Williams said that all of her actions were objectively reasonable and so she is entitled to qualified immunity.

Vargas filed a response saying that the ATFL tear was a serious medical need and that he was told in June that he would be scheduled for surgery. He says that he was told that all non-emergency surgeries were canceled due to budget cuts.

Vargas says that general practitioners, such as Dr. Williams, should not be able to change or modify recommendations from specialists. He says that he should have received a low bunk low row pass because of his medical classification, and the fact that he did not is proof of deliberate indifference. He says that he has been given four different reasons for the cancellation of his December appointment, which shows a genuine issue of material fact.

Next, Vargas reiterates his claim about the cane pass, noting that it was supposed to be for 180 days but it was rescinded less than three weeks after he got it. In his retaliation claim, he again complaining of the timing of the rescission of the cane pass and says that Dr. Williams "should have been held to her professional opinion" when she originally gave the pass. Vargas says that on December 1, Dr. Williams threatened to cancel his specialty clinic appointment, and then this appointment was in fact canceled three weeks later.

Vargas states that he was supposed to have surgery within six months of the date that the ATFL tear was diagnosed, but he did not. He says that if he had been "swinging his cane" as alleged, it would have been considered a security threat.

After recounting Vargas' response to the motion for summary judgment, the Magistrate Judge carried out an extensive review of Vargas' medical records. These records show that Vargas' low bunk and low restrictions were canceled by a physician's assistant named Young upon his arrival at the Eastham Unit, with the notation "does not meet criteria." He was repeatedly seen by medical personnel, at the unit and at the specialty clinic, for his complaints. On October 6, 2003, Vargas was seen by Dr. Williams, who noted that he was wearing a back brace and soft ankle support and

walking with a cane, and that he was attending the Brace and Limb Clinic. She gave him a cane pass and medical shower pass for 180 days.

A week later, Vargas went to John Sealy Hospital in Galveston. An examination there found no significant laxity in his ankle and no crepitus (crackling or grating sounds). The attending medical provider recommended physical therapy, a bottom bunk and bottom row assignment, and high-top work boots.

When Vargas returned to the Eastham Unit, Dr. Williams and P.A. Settles reviewed his chart on October 15, 2003. As a result of this review, they concluded that high-top boots were not required because the normal work boots were adequate. On October 21, Vargas submitted a sick call request asking for additional work restrictions, but was told that his appointment with Dr. Williams on October 6 had included consideration of appropriate work restrictions. On October 23, he was medically unassigned from work.

The next day, Dr. Williams did a chart review, noting that the examination in Galveston on October 13 and found no ankle instability and made no plans for surgery. She concluded that in light of these findings, Vargas did not require high-top boots or a low bunk or low row pass, and that his shower and cane pass were not medically required. Dr. Williams also noted that two nurses had seen Vargas walking normally and swinging his cane.

Vargas saw Dr. Williams again on December 1, 2003. At this time, she noted no swelling or ankle instability and said that his gait was observed to be normal. She concluded that he had a "minor ankle sprain, healing"; Vargas complains that she made this determination without even looking at his ankle, or having him remove his footwear so that she could see it.

On December 23, 2003, the medical records show that Vargas refused a chain transport to the specialty clinic. He filed a grievance in which he said that on December 1, Dr. Williams had told him that she might not let him keep his appointment, which he attributed to retaliation for his filing of grievances. Vargas was allowed to see his medical records, and saw a document in there reflecting that he had refused the chain; however, when he asked for a copy, he was told that this

document was from another inmate and was now in that inmate's chart.  The response to Vargas' Step Two grievance was that another inmate named Vargas had inadvertently signed the refusal form and that when the error was discovered, Vargas was rescheduled for his appointment.

After continuing to trace Vargas' medical records up to the time that he signed the lawsuit, the Magistrate Judge then reviewed the grievances which Vargas had filed, as well as the responses which he received to these grievances.

The Magistrate Judge then turned to Vargas' specific claims.  With respect to his retaliation claim, the Magistrate Judge determined that Vargas had failed to show that but for the alleged retaliatory intent, the incidents complained of would not have occurred.  The Magistrate Judge further determined that Vargas had failed to show that he was subjected to deliberate indifference to his serious medical need.  The Magistrate Judge therefore concluded that there were no disputed issues of genuine material fact and that Dr. Williams was entitled to summary judgment as a matter of law.  The Magistrate Judge also concluded that Dr. Williams was entitled to the defense of qualified immunity.

Vargas filed objections to the Magistrate Judge's Report on September 7, 2007.  In his objections, Vargas first says that he was told by a physician named Dr. Hanson on June 3, 2003, that he would be scheduled for surgery, and that on September 8, 2003, a nurse told him that his scheduled surgical appointment had "fallen through the cracks."  Even assuming that this is correct, however, the medical records show that when he was seen in the specialty clinic in October, it was determined that surgery was not required.

Next, Vargas refers to the phone call from Dr. Shabazz, pointing out that it happened one day before the confiscation of his walking cane.  Although Vargas postulates that this is a chronology from which retaliation may be inferred, the medical records show that on October 8, two weeks earlier, he had been seen in the specialty clinic and his ankle was found to have no significant laxity and no crepitus in his ankle; in addition, two nurses reported having seen Vargas walking normally and swinging his cane.  These facts justified the removal of his cane and shower pass apart from any

retaliatory intent; thus, Vargas has failed to show that "but for" the retaliatory intent, the incident complained of would not have occurred.

Vargas next reiterates his complaint that Dr. Williams "diagnosed" his ankle injury through his pant leg material, a rhino boot, an ankle strap, and a sock.  He says that the fact that he was not allowed to continue the course of treatment prescribed in the specialty clinic indicates deliberate indifference, and that his treatment was so "cursory" as to amount to deliberate indifference itself.  Vargas says that Dr. Williams "considered him a nuisance instead of a patient" and again refers to the cancellation of his cane and shower pass on October 24, as well as other instances in which Dr. Williams spoke harshly to him or claimed that he was "malingering."

Vargas contends that to allow Dr. Williams to claim that she was not involved in the cancellation of his December appointment is "ludicrous" and "a mockery of the court system."  He says that because Dr. Williams was chief medical officer at the unit, all of the other personnel acted at her direction.  He refers to an incident involving another physician's assistant on May 26, 2005, which is after the filing of the lawsuit, and says that he will rely on the cases cited in his response to the motion for summary judgment since he is not a lawyer.

Vargas' objections essentially consist of re-statements of his complaint and testimony, as well as the response to the motion for summary judgment.  He did not specifically address the Magistrate Judge's determination that Dr. Williams was entitled to the defense of qualified immunity.  The issues and arguments which Vargas presents in his objections were thoroughly covered by the Magistrate Judge in the Report.  Vargas' objections are without merit.

The Court has conducted a careful *de novo* review of the pleadings in this cause, including the original complaint, the testimony at the evidentiary hearing, the Defendant's motion for summary judgment and the Plaintiff's response thereto, the competent summary judgment evidence, the Report of the Magistrate Judge, the Plaintiff's objections thereto, and all pleadings, documents, and records in the case.  Upon such *de novo* review, the Court has concluded that the Report of the Magistrate Judge is correct and that the objections of the Plaintiff are without merit.  It is accordingly

ORDERED that the Plaintiff's objections are overruled and that the Report of the Magistrate Judge is ADOPTED as the opinion of the District Court. It is further

ORDERED that the Defendant's motion for summary judgment (docket no. 59) is GRANTED and that the above-styled civil action be and hereby is DISMISSED with prejudice. It is further

ORDERED that any and all other motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **19** day of **September, 2007.**

_____
Ron Clark, United States District Judge